# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MICHAEL MALONE,

              Petitioner,

    v.

MATTHEW KRAMER,

              Respondent.

_____/

1:07-cv-00743 AWI SMS (HC)

FINDINGS AND RECOMMENDATION
REGARDING PETITION FOR WRIT OF
HABEAS CORPUS

[Doc. 2]

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  Petitioner is represented by Charles M. Bonneau, Jr., Esq.

RELEVANT HISTORY

On May 13, 2004, following a jury trial in the California Superior Court, County of Kern, Petitioner was convicted of second degree murder (Cal. Pen. Code § 187(a))[2] and unlawful possession of a firearm by a felon (§ 12021(a)(1)).

On June 28, 2004, Petitioner was sentenced to an indeterminate term of 15 years to life for murder, and a concurrent term of three years for unlawful possession of a firearm.  (CT 140, 1143-1144.)

_____

[1]  Respondent submits that Petitioner is currently in the custody of Warden Matthew Kramer, in Folsom State Prisoner; therefore, Warden Kramer is substituted as the named Respondent in this action.  Fed. R. Civ. P. 25(d).

[2]  All further statutory references are to the California Penal Code unless otherwise indicated.

Petitioner filed a timely notice of appeal with the California Court of Appeal, Fifth Appellate District. On December 19, 2005, the Court of Appeal modified Petitioner's sentence, however, the conviction was affirmed in all other respects. (Lodged Doc. No. 1.)

On January 22, 2006, Petitioner filed a petition for review in the California Supreme Court, which was denied on March 15, 2006. (Lodged Doc. No. 2.)

On August 23, 2006, Petitioner filed a state petition for writ of habeas corpus/and or writ of coram nobis in the Kern County Superior Court. The petition was denied on October 13, 2006. (Lodged Doc. No. 3.)

On or about April 19, 2007, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which was denied on September 25, 2007. (Lodged Doc. No. 4.)

Petitioner filed the instant federal petition for writ of habeas corpus on May 21, 2007. (Court Doc. 1.) Respondent filed an answer to the petition on February 1, 2008, and Petitioner filed a traverse on February 25, 2008. (Court Docs. 12, 14.)

STATEMENT OF FACTS[3]

**Prosecution Case**

Kevin Johnston is a farmer. On May 1, 2002, at approximately 8:30 a.m. he was driving to his property to get gas. He passed three semi-trucks parked on the side of the road. Two of the trucks were red, and one was white. While on his property getting gas, he heard a pop. Shortly thereafter he returned, driving the same route. The trucks were gone, but Johnston saw the body of a woman. Johnston called 911.

Emergency personnel arrived on the scene. The victim, Anna Marie Michaels, was transported to the hospital where she was pronounced dead. At the scene officers found a bullet and a copper jacked from the bullet. In addition, a pair of crutches was found several miles east of where the body was found.

The victim had been shot once. There was an entrance wound in the nape of her neck and an exit wound in the front of her neck. She bled to death as a result of the gunshot wound. She had methamphetamine and amphetamine in her system when she died. It was noted that the victim was an amputee; the amputation of her leg was completely healed and was not a result of the incident leading to her death.

---

[3] The following summary of facts are taken verbatim from the opinion of the California Court of Appeal, Fifth Appellate District. (Lodged Doc. No. 1.) The Court finds the state Court of Appeal's summary is a correct and fair summary of the facts of the case.

The victim was described as a "lot lizard" in the Bakersfield area. "Lot lizard" is a term used for prostitutes and drug dealers who frequent truck stops. She was known in the trucking world as Texas Queen, and she used that name when she conversed on citizen band (CB) radios.

At the time of the killing, [Petitioner] was a truck driver for D & A Trucking in Alabama. He would usually haul chickens from Alabama to Bakersfield. He would pick up produce in Bakersfield and haul it back to Alabama. His CB name was Thunder Chicken. His wife's name is Brenda.

On April 30, 2002, [Petitioner] and Lisa Johnson picked up a load of carrots at Bolthouse Farms in Bakersfield. The shipment's destination was at Piggly-Wiggly in Alabama.

In late April of 2002 the victim called James Howerton to broker a drug deal. Howerton met the victim at the truck stop. She introduced him to [Petitioner]. [Petitioner] gave Howerton cash for a drug deal and [Petitioner], Howerton, the victim, and another woman drove to a prearranged location. Howerton left the location with his cut of the money before the drugs arrived. The drugs were not delivered.

Amanda Chunn (Butter Bean) accompanied Robert Monsignore (Two Speed) to Bakersfield in his truck. When they got to Bakersfield, they met up with [Petitioner] and Lisa Johnson (Little Lisa/Cornbread) at the truck stop. Monsignore had money invested with [Petitioner] in the drug deal and was angry that they were "burned."

[Petitioner] and Johnson got in the truck with Chunn and Monsignore. Chunn heard [Petitioner] talking to Monsignore. [Petitioner] said a woman had "ripped him off" for drugs and he would get her. [Petitioner] said that he had a girl in his truck who was going to help him get the woman out of her house. Chunn and Johnson left in Monsignore's truck headed for Barstow. [Petitioner], Monsignore and the girl left the truck stop in one truck; they were accompanied by a red Volvo truck and a white Peterbilt truck. Johnson and Chunn arrived in Barstow. Monsignore, [Petitioner], and the girl arrived at least an hour later in [Petitioner's] truck.

Tony Bedford was a dispatcher at D & A Trucking. He and [Petitioner] worked together. [Petitioner] had offered to sell him a couple of guns, including a nickel-plated revolver. Bedford was not interested. Sometime in mid-May 2000 [Petitioner] asked Bedford to retrieve a gun he had hidden in the spare tire rack under his pickup truck. Bedford did not retrieve the gun.

Bill Mills (Bad Habit) was a truck driver at D & A Trucking. [Petitioner] told Mills that he had a problem in Bakersfield. He was going to make a drug purchase and the woman took his money but he did not get the drugs. He said that he followed the woman, grabbed her, argued with her in the truck, pushed her out of the truck and shot her two times in the head.

Law enforcement from Kern County traveled to Alabama to interview witnesses. On May 22, 2002, while they were in Alabama, Rick Thomas gave officers the gun he had retrieved from [Petitioner's] pickup truck. The bullet jacket found near the victim was fired from the gun retrieved from [Petitioner's] pickup truck.

[Petitioner] was arrested on May 23, 2002 in California. His truck was stopped. The occupants of the truck were asked to get out. Johnson got out of the truck. Officers asked several times for the other person ([Petitioner]) to get out of the truck. They finally used pepper ball shots and [Petitioner] exited the truck.

[Petitioner] was taken to the police station. When he was asked his name, he said his name was Calvin Johnson. He waived his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436) and talked to Sergeant Joseph Giuffre. A tape of this interview was introduced at trial.

 [Petitioner] was asked why he gave the name of Calvin Johnson. He said he and Lisa Johnson did not know what was going on. He said the last time he went through Bakersfield was approximately two months ago. [Petitioner] said he knew the victim (Texas Queen) and the last time he had seen her was at a truck stop in Bakersfield in the eighties. On further questioning, [Petitioner] said he might have seen her in 1996 or 1997. He said he did not give the victim a ride the last time he was in Bakersfield. He said he had no reason to be upset with her. He denied any involvement in her murder.

James Garza shared a cell with [Petitioner] in jail for several days. [Petitioner] told Garza that he was in jail for murder but he could beat his case because he had records to show he was not present at the time of the murder. He also told Garza that he hid the gun underneath his truck. [Petitioner] said that he had given the victim money for dope, but he got burned. After she took his money, he went looking for her. He described where he found her. At trial, Garza testified that [Petitioner] never said he killed the victim. Garza was impeached with his previous statement that [Petitioner] had told him he shot the victim. Garza was given leniency on his sentence for this information.

[Petitioner] had several telephone conversations from jail with his wife Brenda, and also with Rick Thomas, the individual who turned the gun over to police. Tapes of portions of these conversations were played for the jury.

In the first conversation Brenda said "they" asked me some questions about California. She told [Petitioner] that she told them she did not know anything. She told [Petitioner] she said to "them," "All I know is we got ripped of $1,300 , one's down, one's (inaudible. . . ) That's all I know." Immediately following this comment, [Petitioner] said "I wished you wouldn't have said that." [Petitioner] asked Brenda, "Well then did they find ah the thing?" Brenda replied, "I don't know cause when I got home, they already had it."

The portion of the conversation between Brenda and [Petitioner] from the next day was played as follows:

Brenda: Robert [Monsignore] didn't tell the same story you told me last night or whatever.

Michael [Petitioner]: I know, but what did he tell the cops?

Brenda: That's where your pushing came in.

Michael: He told the cops?

Brenda: Pushing, yeah.

Michael: On [sic], the bitching mother fucker.  Oh, he might as well get ready then cause he's gonna be my next door mother fuckin neighbor.  Ratten' ass mother fucker.

Michael: Well, that's the reason I got picked up then because of Robert.

Brenda: It is?

Michael: Yeah.  And Rick sat there and told me and swore to me that Robert wouldn't never say nothin' like that.

Brenda: I know they're on the outs now.

Michael: Well you need to talk to Rick and ah talk to Robert and ah, ah, tell him ah to where his mama's at, and forget about everything.

Brenda: All right.

Michael: Cause if it, if he don't show up to testify then I don't, if, if I don't have nobody to testify against me then ah, ah they got to drop it.  But I don't know what the fuckin deal is with Bruce Sims.

Brenda: I don't either.  (Inaudible) said he'll be the one taken the (inaudible).

Michael: Well Russell needs to go down there and get the God damn phone book and call that number I told you and tell and tell him what Robert's doin'.  Cause Robert's fixin to get his shit, get his ass in some shit.

Brenda: No, that's what I'm askin you.

Michael: Yeah, thanks to Robert, cause he, he, if I'm goin, he's goin.

Brenda: Why, he was involved in it?

Michael: Well hell yeah.  So advise him to change his fuckin story.  Mother fuckin shit.  God damnit.  Let me go.

[Petitioner] had a conversation with Rick Thomas and Brenda on June 7, 2002.  In that conversation he spoke to Rick about keeping Robert from moving to California. [Petitioner] talked about keeping Robert and Lisa out of California because if they are not "here. . .then they ain't got shit."

In a conversation on June 10, 2002, [Petitioner] dictated a story to Brenda involving Lisa and [Petitioner's] activities on the morning of the killing, as well as how Robert had access to [Petitioner's] pickup truck and that is how the gun ended up there.

**Defense Case**

Several witnesses testified for the defense implicating Dale Carter (Lickity Split) as the person who killed the victim.  Witnesses testified that Carter was mad at the victim because she had ripped him off.  Others testified that Carter said he had killed her.  Other witnesses testified that Garza had made up his testimony at trial.

After May 1, 2002, Carter changed the seats and flooring in his truck.

It was the opinion of a retired fire captain that the victim's body was dumped at the location where it was found and that the dumping location was not the scene of the shooting. He believed that there was not enough blood at the scene where the body was dumped for it to be the scene of the shooting.

It was stipulated that Robert Monsignore (Two Speed) told a detective in an interview that he, William Arnold, and a woman (not Lisa Johnson or Amanda Chunn), drove in a red truck to the victim's house. The woman brought the victim to the truck. Monsignore and Arnold took her to where she was killed.

Lisa Johnson testified that she knew [Petitioner] and drove with him to Bakersfield. They picked up their load at Bolthouse Farms and spent the night in Bakersfield at the truck stop. While at the truck stop the victim asked to use [Petitioner's] CB radio. While the victim was in the truck, Dale Carter jumped up on the side of the truck and yelled at the victim. He wanted his money. He told her she had until 6 o'clock the next day to come up with the money or the Banditos (a motorcycle gang) would get her. [Petitioner] told Carter he didn't want any trouble and Carter left. The victim was terrified. [Petitioner] told the victim nothing would happen to her as long as she was in his truck. The group in the truck used methamphetamine.

Johnson did not see the victim again. Johnson wanted to leave Bakersfield and [Petitioner] wanted to stay and party. Johnson and [Petitioner] argued. Johnson left the truck stop at 9 a.m. with Chunn driving Monsignore's truck. They arrived in Barstow and [Petitioner] and Monsignore arrived approximately 30 minutes later.

**Rebuttal Evidence**

Investigator Mosley said he interviewed Garza. Mosley did not threaten Garza or make any promises regarding his statements of what [Petitioner] had told him.

Johnson was with [Petitioner] when he was arrested several weeks after the crime. When initially interviewed, Johnson did not say anything about Carter. Johnson brought up Carter's name after she had contact with Brenda ([Petitioner's] wife).

(Lodged Doc. No. 1, Opinion, at 2-8.)

## DISCUSSION

A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered

violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises

6

1  out of the Kern County Superior Court, which is located within the jurisdiction of this Court.  28

2  U.S.C. § 2254(a); 2241(d).

3      On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

4  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

5  enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

6  F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

7  Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

8  1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

9  (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

10  petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

11  B.      Standard of Review

12      This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

13  custody pursuant to the judgment of a State court only on the ground that he is in custody in

14  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

15      The AEDPA altered the standard of review that a federal habeas court must apply with

16  respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

17  Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

18  will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

19  to, or involved an unreasonable application of, clearly established Federal law, as determined by

20  the Supreme Court of the United States;" or "resulted in a decision that was based on an

21  unreasonable determination of the facts in light of the evidence presented in the State Court

22  proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of

23  the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v.

24  Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply

25  because that court concludes in its independent judgment that the relevant state-court decision

26  applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations

27  omitted).  "Rather, that application must be objectively unreasonable." Id. (citations omitted).

28

1    While habeas corpus relief is an important instrument to assure that individuals are

2  constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

3  (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

4  criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

5  Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

6  factual determinations must be presumed correct, and the federal court must accept all factual

7  findings made by the state court unless the petitioner can rebut "the presumption of correctness

8  by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115

9  S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day,

10  110 F.3d 1380, 1388 (9th Cir. 1997).

11  C.    Due Process Challenge Under Brady v. Maryland, 373 U.S. 83 (1963)

12    Petitioner contends that the prosecutor withheld crucial evidence implicating  Orbus

13  Weathers being involved in the murder resulting in a violation of his due process rights of the

14  Fifth and Fourteenth Amendments of the United States Constitution under Brady v. Maryland,

15  373 U.S. 83 (1963).

16    Petitioner raised this claim in his state habeas corpus petitions filed in the Kern County

17  Superior Court and California Supreme Court.  (Lodged Doc. Nos. 3 & 4.)  Because the

18  California Supreme Court's opinion is summary in nature, however, this Court "looks through"

19  that decision and presumes it adopted the reasoning of the state superior court, the last state court

20  to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111

21  S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption

22  that higher court agrees with lower court's reasoning where former affirms latter without

23  discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal

24  courts look to last reasoned state court opinion in determining whether state court's rejection of

25  petitioner's claims was contrary to or an unreasonable application of federal law under §

26  2254(d)(1)).

27    In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that "the

28  suppression by the prosecution of evidence favorable to an accused upon request violates due

process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." See also Strickler v. Greene, 527 U.S. 263, 280-281 (1999). The Supreme Court has stated that the duty to disclose such evidence is applicable even though there has been no request by the accused.  United States v. Agurs, 427 U.S. 97, 107 (1976).  The duty to disclose encompasses impeachment evidence as well as exculpatory evidence.  United States v. Bagley, 473 U.S. 667, 676 (1985).  Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Id. at 682; see also Kyles v. Whitley, 514 U.S. 419, 433-434 (1995). Additionally, "the rule encompasses evidence 'known only to police investigators and not to the prosecutor.'"  Strickler, 527 U.S. at 280, *quoting* Kyles, 514 U.S. at 438.  To constitute a Brady violation, the Supreme Court has set forth a three-part test: 1) "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; 2) "[T]hat evidence must have been suppressed by the State, either willfully or inadvertently"; and 3) "[P]rejudice must have ensued."  Strickler, 527 U.S. at 218-282.  Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985). "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."  Id. at 678.

In denying Petitioner's claim, the state court held:

No Brady error occurred.  The prosecution did not fail to disclose exculpatory material evidence to the defense.  A review of Patricia Allen's declaration and the letter in which the District Attorney acknowledged that Ms. Allen attempted to contact his office before trial, reveals that the parties never established contact and consequently the District Attorney had much less information in his possession than Petitioner suggests.  Ms. Allen only states that she attempted to contact the District Attorney's office before the trial and intended to tell him, among other things, that Orbus Weathers and Charlie Sharp murdered the victim.  However, she was not able to establish contact until after the trial. The District Attorney states that Ms. Allen called him at or near the time of trial and left a message indicating that "Orbus Weathers was a bad guy and not to be trusted."  He returned the call, but Ms. Allen never called back.  Accordingly, the

only information the prosecutor had from Ms. Allen before the trial was that she had an unfavorable opinion of Orbus Weathers.  However, that did not constitute evidence favorable to the defense.  It said nothing about the murder or who might have committed it.

(Lodged Doc. No. 3, Opinion, at 2.)

A finding that no suppression has occurred under <u>Brady</u> is a finding of fact entitled to the presumption of correctness under the AEDPA.  <u>Ortiz v. Stewart</u>, 149 F.3d 923, 935 (9th Cir. 1998).  The state court reasonably determined that no <u>Brady</u> violation occurred because it is undisputed that the prosecutor was not in possession of the information regarding Orbus Weathers until after the trial took place.  Although both Patricia Allen and the prosecutor indicated that Allen attempted to make contact with the prosecutor before and during trial, there was no actual personal contact until well after the trial ended.  Specifically, in her declaration, Allen declares that she "attempted to contact" the District Attorney before Weathers was transported to Kern County for trial; however, she only "spoke to the prosecutor after the trial." (Declaration of Allen, at 1, lines 7-9, 11.)  By written letter, the prosecutor states that Allen called and left messages at or near the time of trial.  Allen's messages indicated that "Orbis [sic] Weathers was a bad guy and not to be trusted[,]" and nothing in the message gave any indication as to any involvement in Petitioner's criminal case.  The prosecutor returned her call and left a message for her, but he did not hear back.  The prosecutor noted that it was only "a few months" earlier (and well after the trial) that Allen personally contacted him to inform him about Orbus Weathers and Charles Sharp.  (Letter of Scott J. Spielman, Deputy District Attorney.)  The state court proceedings had concluded over a year prior to the date of the prosecutor's letter.

This witness sought to disclose her information at or near the time of Petitioner's trial, and the prosecution attempted to obtain any information by returning the phone call.  As the case stood, the prosecution was aware of nothing more than that Ms. Allen looked disfavorably upon Orbus Weathers.  Petitioner has offered nothing to demonstrate that the prosecution unlawfully withheld exculpatory evidence, and he has failed to rebut the presumption of correctness that attaches to the state court's determination.  28 U.S.C. 2254(e)(1).  Although, the prosecution ultimately spoke with Ms. Allen after the trial took place, before and during the trial  the only

information in the possession of the prosecution was that she did not favor Weathers.  Moreover,

the fact that this information was disclosed subsequent to the trial has no bearing on Petitioner's

Brady claim as there is no indication that the prosecutor was aware or had possession of such

information.  See Sanchez v. United States, 50 F.3d 1448, 1453 (9th Cir. 1995) ("The government

has no obligation to produce information which it does not possess or of which it is unaware.").

Simply stated, without knowledge of any information regarding any potential culpability of

Weathers, the prosecutor could not have violated the rule pronounced in Brady, and its progeny.

See United States v. Plunk, 153 F. 3d 1011, 1027 (9th Cir. 1998); United States v. Hsieh Hui Mei

Chen, 754 F.2d 817, 824 (9th Cir. 1985).

Moreover, the state court reasonably applied Brady to conclude that Allen's information

known to the prosecutor during trial (that she had an unfavorable opinion of Weathers) was not

material evidence favorable to Petitioner.  A Brady violation can only be established if the

evidence is "material" and there must be a "reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different."  United States

v. Bagley, 473 U.S. at 682.  As Respondent submits, even if Allen's information had some

exculpatory value, Petitioner did not suffer prejudice from the nondisclosure of such information.

First, the only evidence in the prosecutor's possession at the time of trial was that Allen believed

that Orbus Weathers "was a bad guy and not to be trusted," which was inadmissible at trial.

Respondent correctly points out that there currently exists a split among appellate courts as to

whether evidence that is not admissible at trial is immaterial under Brady and, therefore, the

failure to disclose such inadmissible evidence does not violate Brady.  See Paradis v. Arave, 240

F.3d 1169, 1178 (9th Cir. 2001) (stating "[t]here is no uniform approach in the federal courts to

the treatment of inadmissible evidence as the basis for *Brady* claims[,]" citing some circuits have

held that if evidence is inadmissible itself then cannot be considered material under Brady; while

others allow inadmissible evidence if it could have led to discovery of admissible evidence.);

People v. Hoyos, 41 Cal.4th 872, 919 n.28 & 29 (2007).  The Supreme Court has not definitely

resolved the issue.  In Wood v. Bartholomew, 516 U.S. 1 (1995), the Supreme Court stated even

if it presumed (without deciding), that the inadmissible evidence of the polygraph might have led

to additional discovery of admissible evidence, any impact on the outcome of the case was purely speculative. Id. at 6-7, 9-11.

Consequently, because there is a split among appellate courts on this issue, and because the Supreme Court has not definitely ruled on the issue, the state court could not have unreasonably applied *clearly established* United States Supreme Court authority, as defined under § 2254(d)(1); see also Boyd v. Newland, 467 F.3d 1139, 1152 (9th Cir. 2007), cert. denied Newland v. Boyd, 127 S.Ct. 2249 (2007) (where there is a conflict among the courts, the state court's decision was not an unreasonable application of clearly established Supreme Court precedent); Bailey v. Newland, 263 F.3d 1022, 1032 (9th Cir. 2001) ("In view of the difference of opinion among the courts of appeal . . . we cannot say that the state court unreasonably applied clearly established Federal law.").

In any event, there was strong evidence in support of Petitioner's guilt.  At trial, Kevin Johnston, a farmer, stated that on the morning of May 1, 2002, he passed two red trucks and a white truck parked on the side of a country road.  After he drove past, he heard a gunshot and drove back where he discovered Ann Michaels' dead body on the side of the road in the same place the trucks had been parked.  (RT 592-606.)  It was undisputed that there were at least three individuals involved in the killing as there were three vehicles present at the scene.  It was clearly established that Petitioner and Robert Monsignor were upset about being "ripped off" in a drug deal with Ann Michaels.  (RT 1076, 1073, 1088-1091, 1125-1128, 1159, 1163.)  Testimony by Amanda Chunn established that she was riding in the truck with Robert Monsignor, and they met up with Petitioner and Lisa Johnson at a truck stop in Bakersfield on the evening before the murder.  (RT 1081.)  Petitioner was talking about an incident where a girl ripped him off for drugs and he said he "would get that bitch."  (RT 1073.)  Chunn testified that Petitioner, Monsignor, and an unidentified female had implemented a plan to get Ann Michaels out of her home.  (RT 1077.)  Petitioner and Monsignor left simultaneously in a red truck and white truck.  (RT 1074.)  The next morning Chunn and Lisa Johnson (the female who accompanied Petitioner) drove together in Monsignor's truck to Barstow.  (RT 1075-1077.)  Later that day, Petitioner and Monsignor met up with them in Barstow.  (Id.)

12

In addition, the murder weapon was found in Petitioner's possession in Alabama.  (RT 722,-723, 742-752.)  There was testimony that Petitioner had admitted his involvement in the shooting of Ann Michaels after being "ripped off" in a drug deal.  (RT 446-447, 466, 619-629.)  Moreover, the prosecution introduced the recording of a telephone conversation Petitioner had with his wife while he was in jail.  At one point in the conversation, the two talked about being ripped off of money and one person being killed. (CT 843.)  Petitioner also questioned the whereabouts of his gun,  discussed attempts to prevent witnesses from testifying against him at trial, and fabricating evidence.  (RT 843-844, 846-848.)  Furthermore, Petitioner resisted arrest and gave a false name to police.  (RT 1184-1187.)  Then, during the police interview, Petitioner initially stated that he had not seen Ann Michaels in several years, then recanted and stated that he had seen her the night before the murder.  (RT 1123-1128, 2020-2021.)  These factual circumstances reasonably support an inference of a consciousness of guilt.

Any attempt by Petitioner to argue that the implication of Orbus Weathers as the killer exonerated him completely of the offense is unfounded.  As previously stated, it was undisputed that there were at least three individuals involved in the murder, and merely pointing the finger to one more individual who may have been involved would not have excluded Petitioner from the groups of individuals who murdered Michaels.  Indeed, there was evidence that a number of people, including Petitioner, had a desire to kill Michaels after being burned in drug deals.  (See RT 446-447, 1073, 1088, 1091, 1250-1254, 1498-1499, 1539-1544, 1569-1571.)

D.    "Newly Discovered" Evidence Corroborated Defense

Petitioner contends that the "newly discovered evidence" provided by Patricia Allen, subsequent to trial, corroborated his defense that Dale Carter was involved in Ann Michaels' murder.  In support of this contention, Petitioner submits the declarations of Orbus Weathers and Robert Everett.  Petitioner contends that the discovery of this new evidence violated his right to due process.

Petitioner raised this claim by way of state habeas corpus petition.  The state superior court denied the claim in a reasoned decision, finding that the evidence "[a]t most, [] only shows that others may have been involved in the murder.  It does not show that Petitioner did not kill

1 the victim or have any part in the killing." (Lodged Doc. No. 3, Opinion, at 3-4.)  Because the

2 California Supreme Court summarily denied the petition, this Court looks through that denial to

3 the state superior's court's decision and presumes it adopted such reasoning.

4        At trial, Petitioner presented a defense that Dale Carter admitted to shooting Ann

5 Michaels. Petitioner contends that following up on the information provided by Patricia Allen

6 after the trial, the defense investigator was able to discover additional evidence corroborating that

7 Carter was directly involved in the killing.  (Petition, Memorandum of Points and Authorities, at

8 32.)  To this end, Petitioner submits the declarations of Orbus Weathers and Robert Everett.

9        Orbus Weathers declares that he is familiar with Petitioner and the murder of Ann

10 Michaels, and that "Lickety Split" (Dale Carter) threatened to kill "Texas Queen" (Ann

11 Michaels), then bragged about committing the murder. (Petition, Exhibit 6.)  In addition, he is

12 aware of the fact that the interior of Carter's truck was changed. (Id.)

13        Robert Everett, declares that John Bess informed him that he observed blood soaked

14 matresses and clothing from Dale Carter's truck being burned shortly after the murder of

15 Michaels. (Petition, Exhibit 7.)

16        As with Petitioner's prior claim, it fails under Brady.  As Respondent correctly submits,

17 Petitioner does not explain how private investigator, Joseph Serrano, learned about Weathers'

18 and Everett's recent statements.  And, more importantly, Petitioner fails to demonstrate how this

19 "newly discovered" evidence is attributed to the prosecution.   Petitioner has failed to

20 demonstrate that the prosecutor knew about Everett or any statement made by him.[4]

21        Serrano's declaration does not disclose how this "new" evidence was discovered.  Indeed,

22 Serrano merely states that the letter from the prosecutor about Allen's messages "renewed" his

23 investigation and prompted him to conduct new interviews and pursue other investigations.

24 (Serrano Declaration, at 1.)  Defense counsel's declaration, likewise, does not reveal how

25 Serrano was lead to evidence corroborating Dale Carter's involvement in the murder.  (J.

26

27        [4]  To the contrary, the parties knew about Orbus Weathers as he testified as a defense witness at trial.  (RT
1601-1608.)  In fact, Weathers testified that Carter changed the interior of his truck after Michaels' murder, thus
28 such evidence is not properly classified as "new."  (RT 1603-1604.)

1   Anthony Bryan Declaration, at 1-2.)  In addition, there is simply no information in any of the

2   declarations as to how Serrano learned of Robert Everett.  Consequently, Petitioner has not

3   established a Brady violation.

4          In any event, any claim by Petitioner that the prosecutor's failure to disclose the

5   information provided by Patricia Allen before or during trial prevented him from discovering the

6   evidence by Robert Everett or Orbus Weathers is without merit.  As discussed above, because

7   there simply was no initial Brady violation, there is likewise no Brady violation for evidence

8   derived from the Allen information, and the state courts' determination of this issue was not

9   contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

10  E.     Discovery of Information Regarding Charlie Sharp

11         Petitioner contends that his right to due process of law was violated by the discovery of

12  new evidence implicating Charlie Sharp as one of the participants in Michaels' murder.

13         Respondent submits that the United States Supreme Court has never held that newly

14  discovered evidence of innocence is a basis for federal habeas relief absent an independent

15  constitutional violation in the underlying trial, citing Herrera v. Collins, 506 U.S. 390, 400

16  (1993); Townsend v. Sain, 372 U.S. 293, 317 (1963); and House v. Bell, 547 U.S. 518, 126 S.Ct.

17  2064, 2086-2087 (2006).  In order to seek relief under § 2254 based on newly discovered

18  evidence, such evidence must relate and bear upon an independent constitutional violation.

19  Respondent is correct, and any attempt by Petitioner to use this "new evidence" to craft an

20  alleged Brady violation is unfounded.

21         As with Petitioner's prior two claims, any alleged Brady violation fails.  As discussed

22  above, the information from Patricia Allen did not constitute Brady information, and because

23  there was no Brady violation for not disclosing such information, there can be and is no Brady

24  violation for any evidence alleged to be derived therefrom.  There is simply no basis in this

25  record to grant habeas corpus relief based on this evidence.

26         Moreover, this evidence, even assuming it to be true, does not support a finding that

27  Petitioner would be completely exonerated.  To the contrary, for the reasons explained *supra*

28  under section C, there is sufficient evidence in the record to support the jury's finding of guilt

1    beyond a reasonable doubt.

2

3    F.      Violation of Due Process and Right to Fair Trial

4           Petitioner further contends that the prosecutor's failure to keep in contact with an

5    informant, failure to reveal exculpatory evidence under Brady, and the trial court's finding that

6    Petitioner was not entitled to discovery in the possession of the Federal Bureau of Investigations,

7    violated his due process right to a fair trial.

8           Petitioner raised these claims on direct appeal to the California Court of Appeal, Fifth

9    Appellate District and California Supreme Court.  Because the California Supreme Court issued

10   a summary denial, this Court looks through" that decision and presumes it adopted the reasoning

11   of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst

12   v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)

13   (establishing, on habeas review, "look through" presumption that higher court agrees with lower

14   court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson,

15   217 F.3d 663, 669 n.7 (9th Cir.2000) (holding federal courts look to last reasoned state court

16   opinion in determining whether state court's rejection of petitioner's claims was contrary to or an

17   unreasonable application of federal law under § 2254(d)(1)).

18          1.      Failure to Maintain Contact With Government Informer

19          The California Court of Appeal thoroughly reviewed and summarized the background of

20   this claim as contained in the trial record and stated:

21              [Petitioner] filed a blitz of motions for discovery and to disclose a
             confidential informant.  He focused on two particular concerns.  First, [Petitioner]
22          claimed that the FBI had secured information from a confidential informant
             regarding the killing and had passed the information along to law enforcement in
23          Kern County. [Petitioner] claimed that the FBI information led to his arrest and,
             more importantly, claimed that the FBI is part of the prosecution team and thus
24          the district attorney was required to disclose all information in the possession of
             the FBI. [Petitioner] theorized that the FBI was conducting an interstate drug
25          smuggling investigation and the informant gave information regarding the killing
             in order to curry favor with the FBI.

26

27

28              The second area contained throughout the motions was that Lee Carnes
             (aka Billy Vines) was hired by the prosecution to compile evidence and interview

                                                 16

witnesses. [Petitioner] wanted access to Carnes.  Eventually the trial court ordered that the prosecution produce Carnes at an in camera hearing.  When the prosecution did not produce Carnes for the scheduled in camera hearing, the court ordered that the district attorney disclose Carnes's whereabouts.  The district attorney said he did not know Carnes's whereabouts but agreed to arrange for defense counsel to talk to Carnes over the telephone.  Two telephone calls took place, and Carnes gave the People an address where he could be reached in Mexico.  Neither defense counsel nor the People were able to locate Carnes.

(Lodged Doc. No. 1, Opinion, at 8.)

Next, with regard to Petitioner's claim that the prosecutor failed to disclose all exculpatory evidence and the trial court erred in denying his request for discovery, the Court of Appeal, held in pertinent part, as follows:

Agent Deal of the FBI told Detective Fidler that an informant had advised him that the [Petitioner] had admitted to having killed the victim.  Detective Fidler used the name given to him by the FBI agent, as well as other information he had gathered pointing towards [Petitioner] as the perpetrator of the killing, in seeking a warrant for [Petitioner's] arrest.

The district attorney had requested all information in the possession of the FBI relating to [Petitioner's] case, but the FBI refused to release any information to the district attorney.

To start, this is not a case in which the prosecution suppressed evidence: the defense was made aware that Detective Fidler received a tip from an FBI agent.  The prosecution did not have in their actual possession anything over and above the tip.

[Petitioner's] argument fails for several reasons; in particular, the materials in question were not reasonably accessible to the prosecution and defendant has failed to show any materiality.

The prosecution's constitutional and statutory duty to disclose only extends to materials and information in the prosecutor's possession or which are reasonably accessible to the prosecution.  (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 57.)

............................................................................................................

In the present case, the record does not suggest any connection between the prosecution and the FBI.  The FBI merely forwarded information to the prosecution that it had received in the normal course of its business.  The FBI was not involved in any investigation nor was it acting on behalf of the prosecution when the informant told agents [Petitioner] had stated that he had killed the victim. [Petitioner's] theories are not sufficient to show that the FBI was acting as part of the prosecution team when it passed along information it had obtained inadvertently.  The free exchange of information would be stifled if entities are found to be part of the "prosecution team" each time they independently and inadvertently learn of and pass along information that might be helpful to another agency.  We do not believe that the broad discovery rules were meant to cast such a wide net in finding one to be a part of the prosecution team.

1    In any event, [Petitioner] has failed to show that the evidence was
material.  Evidence is "material" only if there is a reasonable probability that, had
2    it been disclosed to the defense, the result would have been different.  A
reasonable probability is a probability sufficient to undermine confidence in the
3    outcome.  (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 57.)  The mere possibility
that an item of undisclosed evidence might have helped the defense does not
4    establish materiality in the constitutional sense.  (*Id.* at p. 58, fn. 15.)  Although
[Petitioner] repeatedly tried to weave a story about the materiality of the evidence
5    by tying it into a federal drug investigation, there is nothing in the record to
suggest that the evidence is anything other than information that the [Petitioner]
6    told someone that he killed the victim.  There is nothing to suggest the informant
was an active participant or eyewitness to the event nor is there anything but pure
7    speculation that would cause this evidence to be considered to be exculpatory.
[Petitioner] has not shown the evidence is material.

8

9    Finally, [Petitioner's] quest to receive information from the FBI in essence
seeks to have the FBI disclose the informant's identity.  We have reviewed the
10   transcript of the in camera proceeding and we are convinced, as was the trial
court, that there is no reasonable possibility that the informant or the FBI could
11   offer evidence on the issue of guilt that might result in [Petitioner's] exoneration.
Disclosure is not required when the informant merely pointed the "finger of
12   suspicion" at the defendant.  (*People v. Wilks* (1978) 21 Cal.3d 460, 469.)

13   (Lodged Doc. No. 1, Opinion, at 9-14.)

14   As previously stated, there is no dispute that the prosecution's duty to disclose

15   information under <u>Brady</u> encompasses evidence that is not actually in its possession.  That is,

16   prosecutors have "a duty to learn of any favorable evidence known to the others acting on the

17   government's behalf in the case, including the police."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 437

18   (1995).  The prosecution is under a duty to search and disclose only that information which is in

19   the hands of agencies actually involved in the investigation and/or prosecution of the defendant.

20   <u>United States v. Zuno-Arce</u>, 44 F.3d 1420, 1427 (9th Cir. 1995) (the prosecutor is "deemed to

21   have knowledge of access to anything in the custody or control of any federal agency

22   participating in the same investigation of the defendant.") The determination of whether a

23   particular government agency is part of the prosecution team is dependent on the degree of

24   involvement and cooperation with the prosecution.

25   The state courts determination that the FBI was not part of the "prosecution team" and the

26   county prosecutor was not required to disclose information in the FBI's possession, was not

27   contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor

28   "based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding." 28 U.S.C. §§ 2254(d)(1), (2).  First and foremost, as pointed out by the appellate court, this is not a case in which the prosecution withheld information, as it was readily disclosed to the defense that Detective Fidler received a tip from the FBI that Petitioner had confessed to the killing of Michaels.  There is no evidence that the FBI was working on behalf of the Kern County District Attorney's Office, and it was not part of the prosecution team.  The FBI received information in the normal course of its business and merely disclosed that information to the District Attorney's Office.  Such action on the part of the FBI does not render it part of the prosecution team.  Indeed, at the time the FBI received the information from the informant, it was not involved in any investigation of the murder of Ann Michaels.

> 2.    Trial Court's Denial of Petitioner's Request for Discovery of Information From FBI

Next, with regard to Petitioner's claim that the prosecutor failed in its duty to keep in contact with the informant, the Court of Appeal thoroughly summarized the background regarding this claim and stated, in pertinent part, the following:

> Whether or not the prosecution correctly sought initially to protect the identity of Carnes is a moot issue.  The court ordered the prosecution to produce Carnes for an in camera hearing.  The prosecutor failed to do so.  The court then ordered the prosecution to disclose the identity of the witness as well as his present whereabouts.  The district attorney stated he did not know the exact whereabouts of Carnes.

> Several months after this hearing, [Petitioner] filed a motion for an order imposing the sanction of dismissal because the prosecutor failed to disclose the true identity and location of Lee Carnes. [Petitioner] acknowledged that the prosecutor had arranged for defense counsel to interview Carnes over the telephone.  Defense counsel was not satisfied with the responses from Carnes because Carnes seemed to have shared information with witnesses from hearsay he heard on his CB radio and now he was being evasive regarding the depth of his knowledge. [Petitioner] asked for dismissal based on noncompliance with an order of discovery.

> The prosecutor filed a declaration in response to [Petitioner's] motion for sanctions.  The prosecutor stated that he attempted to bring Carnes to court several times for an in camera hearing to determine if he was a material witness, but was unsuccessful in doing so.  After the court ordered disclosure of Carnes's name and whereabouts, the prosecution provided a telephone number to defense counsel so he could speak to Carnes and defense counsel did speak to him.  Defense counsel requested Carnes's address.  Carnes told the prosecutor he had recently moved and in two weeks he would have a new address which he would provide.  Another telephone conversation took place, and the People expressed their willingness to stipulate that certain of Carnes's statements could be used at trial.  Defense counsel was not satisfied and still wanted the address.  Carnes said he would give

it to the prosecutor the following day.  Carnes provided the address a few days later, and the prosecutor gave the address to defense counsel.  The prosecutor declared that he facilitated contact with Carnes by defense counsel and provided an address when that address became known.

At the hearing, defense counsel complained that Carnes would not provide him with his true name or his address.[5]  Counsel argued that he had demanded the address for a long time and had only recently been provided with an address in Mexico City without a name.  He contended the prejudice was that he was being precluded from calling a witness who was an agent in the case, and thus his client was being deprived of a fair trial.  He stated that the prosecutor's culpability was irrelevant, but that he was being "frozen out of a paid agent that the Sheriff's Department hired in this case."  The court denied the motion.

Although [Petitioner] argues on appeal that the People failed to make contact with Carnes or keep track of his whereabouts, the record expressly refutes this assertion.  In his declaration in support of his motion to continue, defense counsel stated; "Deputy District Attorney, Scott Spielman has long since been ordered to produce information regarding 'Lee Carnes' sufficient for the defense to affect out-of-state service.  Although I believe Mr. Spielman has tried, Mr. Carnes has not co-operated."  At the hearing on the motion for sanctions, defense counsel stated that the culpability of the district attorney was irrelevant.

Unlike the situation in *Eleazer*, it has not been shown that the prosecutor or other law enforcement agency had access to or the ability to gain the information regarding Carnes's whereabouts.  While defense counsel was complaining and complaining [sic] that he did not have access to the witness, once Carnes's name was officially exposed, there is no showing that the prosecution did not make best efforts to obtain communication with and access to Carnes.  By acknowledging that the prosecutor tried to locate Carnes, but that Carnes had not cooperated, and by stating that the culpability of the prosecutor was not relevant, defense counsel removed the focus from the good faith effort of the prosecution.  He is precluded on appeal from twisting the argument here into something that was not the basis of the argument in the trial court.

We note that unlike in 1970, when *Eleazer* was decided, individuals currently may communicate via cellular telephones or internet connections without those communications being tied to a particular location.  It appears that most, if not all, of the communications with Carnes were via telephone.  Law enforcement and the prosecution cannot be faulted when their reasonable efforts fail to locate an individual who communicates via telephone and is unwilling to disclose his whereabouts.

[Petitioner] has failed to show that the prosecution failed to meet its obligation to maintain contact with Carnes.

(Lodged Doc. No. 1, Opinion, at 14-18.)

---

[5]  "At the end of a telephone conversation among Carnes, defense counsel, and the prosecutor, Carnes stated, 'Does he know my first name is Terry?  Am I still on speaker phone?'  Defense counsel claimed this was evidence that the prosecution was withholding the true name of Lee Carnes.  The prosecutor stated in court that as an officer of the court he had never known Carnes by the name of Terry and he told defense counsel this.  Defense counsel accepted this assertion by the prosecutor."

1    The duty to disclose informants is generally governed by <u>Rovario v. United States</u>, 353

2    U.S. 53, 59-61 (1957), not <u>Brady</u>.  In finding that Petitioner's claim was without merit, the state

3    appellate court cited and distinguished <u>Eleazer v. Superior Court</u>, 1 Cal.3d 847, which in turn

4    relied on <u>Rovario</u>.  The government must show reasonable efforts in producing or attempting to

5    produce the confidential informant at the time of trial or for an interview.  Such requirement was

6    expressed by the Ninth Circuit in <u>Velarde-Villarreal v. United States</u>, 354 F.2d 9, 12 (9th Cir.

7    1965), where the Court stated:

8            If it were made to appear that the Government, through reasonable effort,
     could have produced [the confidential informant] and yet failed to do so when
9    defendant demanded such production, there should be a new trial.  On the other
     hand, if the Government was actually unable by reasonable effort to produce him,
10   . . . such inability would [not] require a dismissal of the case, unless of course the
     Government itself purposely saw to it that [the confidential informant]
11   disappeared[.] . . . .

12   In this instance, it is clear the prosecutor did all that was required under

13   the law as he engaged in reasonable and diligent efforts to locate the informant.  He set up two

14   separate interviews between the informant and defense counsel, and provided his name and

15   address, as soon as the information was made available to him.  However, despite the

16   prosecutor's reasonable efforts, Carnes simply was not cooperative and the prosecutor had no

17   control over such actions. (<u>See</u> SCT 302-303; CT 658-660, 663-668.); <u>see</u> <u>also</u> <u>United States v.</u>

18   <u>Montgomery</u>, 998 F.2d 1468 (9th Cir. 1993) (reasonable efforts at time of trial to locate

19   informant.)  Therefore, the state courts' determination of this issue was not contrary to, or an

20   unreasonable application of, clearly established Supreme Court precedent, nor was it based on an

21   unreasonable determination of the facts in light of the record before the State court.

22   G.    <u>Sixth Amendment Confrontation Clause Violation</u>

23   Petitioner contends that the secretly-recorded jail phone conversation between he and his

24   wife violated his right to confrontation under the Sixth Amendment of the United States

25   Constitution under <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).

26   Prior to trial, Petitioner sought to exclude the admission of his secretly-recorded jail

27   phone conversations with his wife under the Sixth Amendment as defined by <u>Crawford</u>.  (RT

28   311-313, 319; CT 746-751.)  Petitioner argued that the recording was testimonial as defined by

21

1 Crawford, and must therefore be subject to cross-examination.  After conducting a lengthy

2 hearing, the trial court denied Petitioner's request and ruled that the prosecution could introduce

3 certain portions of the recorded phone conversation.  (RT 320, 348.)

4  Petitioner raised this claim on direct appeal to the California Court of Appeal and

5 California Supreme Court.  In the last reasoned state court opinion, the Court of Appeal analyzed

6 Crawford and held, in pertinent part:

7  [Petitioner's] telephone conversations from jail were recorded by jail
personnel.  When each telephone call was placed, a recorded message was played.
8 The message stated, "All numbers dialed and conversations may be subject to
monitoring and recording without further notice.  By using this telephone and
9 accepting this call, you agree to the monitoring and recording."

10  In *Crawford v. Washington*, *supra*, 541 U.S. 36 the prosecution introduced
at trial a tape recording of a police interview with a witness who did not testify.
11 The United States Supreme Court reversed the conviction, finding that the
interview was not admissible.  The court held that unless a witness is unavailable
12 at trial and the defendant has had an opportunity to cross-examine the witness the
out-of-court "testimonial" hearsay is barred by the confrontation clause.  The
13 *Crawford* court did not spell out a comprehensive definition of "testimonial."  It
did state that "whatever else the term covers, it applies at a minimum to prior
14 testimony at a preliminary hearing, before a grand jury, or at a former trial; and to
police interrogations.  These are the modern practices with closest kinship to the
15 abuses at which the Confrontation Clause was directed."  (*Id*. at p. 68.)

16  .............................................................................................................

17  [Petitioner] argues that the taped conversations were testimonial because
the purpose of recording the calls was to introduce the contents of the calls as
18 evidence of [Petitioner's] guilt.

19  The test in *Crawford*, while including a component of the purpose of
capturing the statement, is not resolved merely by looking at the purpose behind
20 the taking of the statement.  *Crawford* speaks in terms of an examination by law
enforcement leading to a statement.  The telephone conversations here were not in
21 any way an examination by law enforcement.  No questions were asked by law
enforcement; law enforcement did nothing but sit back and record what was said.
22 In addition, the recording of jailhouse conversations is directly related to the
security of the penal institution.  Recorded jailhouse conversations are similar to
23 the situation where a guard overhears a conversation between an inmate and a
visitor in a penal institution where [Petitioner] has forfeited most, if not all, of any
24 expectation of privacy.

25

26  In addition, the court in *Crawford* stated that "not all hearsay implicates
the Sixth Amendment's core concerns.  An off-hand, overheard remark might be
27 unreliable evidence and thus a good candidate for exclusion under hearsay rules,
but it bears little resemblance to the civil-law abuses the confrontation Clause
28 targeted."  (*Crawford v. Washington, supra*, 541 U.S. at p. 51.)

Recorded jailhouse telephone conversations are more closely akin to the "off-hand, overheard remark" statements identified in *Crawford* as not implicating the core concerns of the Confrontation Clause.  This was the conclusion that was reached in *State v. Ohio Hang Saechao* (2004) 195 Ore.App. 581 [98 P.3d 1144].  We agree with that analysis.  The recorded jailhouse telephone conversations were not testimonial within the meaning of *Crawford*.

(Lodged Doc. No. 1, Opinion, at 20-23.)

The state appellate court properly cited and applied the Supreme Court's holding in

<u>Crawford</u> to the factual circumstances of this case.  This Court agrees with the California Court

of Appeal's conclusion that Petitioner's telephone statements to his wife were nontestimonial.

Indeed, the statements were not elicited by law enforcement personnel, as they did nothing more

than sit back and listen, albeit lawfully, to the conversation between Petitioner and his wife.[6]   As

such, the implications of <u>Crawford</u> are simply not present in this case, and the state courts'

determination of this issue was not contrary to, or an unreasonable application of, clearly

established Supreme Court precedent, nor "based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding."  28 U.S.C. §§ 2254(d)(1), (2).

H.    <u>Instructional Error</u>

Petitioner contends that he was denied his rights to present a defense and due process

under the Sixth and Fourteenth Amendments by the trial court's refusal to provide a jury

instruction on the uncharged, lesser related offense of accessory-after-the-fact (§ 32) to murder.

Petitioner raised this claim on direct appeal to the California Court of Appeal and

California Supreme Court.  As with the preceding claim, because the California Supreme Court

summarily denied the petition, this Court looks through that decision and presumes it adopted the

last reasoned state opinion of the Court of Appeal.  <u>LaJoie v. Thompson</u>, 217 F.3d at 669 n.7.

During discussion regarding the jury instructions, Petitioner argued he was entitled to an

instruction on the uncharged lesser-related offense of accessory-after-the-fact, and the prosecutor

---

[6]  The Constitution does not prohibit the eavesdropping or recording of conversations in a prison, jail, or police station.  <u>Lanza v. New York</u>, 370 U.S. 139, 143-144 (1962) (rejecting the notion that the visiting room of a public jail is a constitutionally protected area); <u>United States v. Van Poyck</u>, 77 F.3d at 290-291 (holding that audiotaping of pretrial detainee's telephone calls did not implicate the Fourth Amendment); <u>Donaldson v. Superior Court</u>, 35 Cal.3d 24, 29 (1983) ("Federal courts, however, have consistently followed Lanza and upheld admission of monitored conversations in jails or police stations.")

1  objected.  (RT 1992-1997.)  The trial court denied Petitioner's request relying on California case

2  law which held that a "defendant has no constitutional right to request instruction on an

3  uncharged lesser-related offense that are not necessarily included in the charged offense" and

4  found the request factually inappropriate.  (RT 2000.)

5      In denying Petitioner's claim on direct appeal, the Court of Appeal held that the

6  California Supreme Court's holding in *People v. Birks*, 19 Cal.4th 108 (1998), "that the trial

7  court may not modify the charging process by instructing on related, but uncharged offenses[,]"

8  precluded any claim for relief.  (Lodged Doc. No. 1, Opinion, at 26.)

9      The United States Supreme Court has held that state courts are not constitutionally

10  compelled to instruct on uncharged lesser related offenses.  Indeed, in Hopkins v. Reeves, 524

11  U.S. 88 (1998), the Court found an instruction on a lesser related offense to murder not

12  warranted, stating:

13          Almost all States, . . . provide instruction only on those offenses
            that have been deemed to constitute lesser included offenses of the
14          charged crime. [Citation.] We have never suggested that the
            constitution requires anything more.

15  Id. at 96-97, 100 n.7; Van Woudenberg ex. rel Foor v. Gibson, 211 F.3d 560, 572 (10th Cir. 2000)

16  (failure to instruct on accessory after the fact was not error where the crime was not lesser

17  included offense); Johnson v. Puckett, 176 F.3d 809-818-819 (5th Cir. 1999) (no constitutional

18  right to a lesser related instruction on an uncharged offense).

19      In a related contest, the United States Supreme Court has held that the failure to instruct

20  on a lesser *included* offense in a capital case is constitutional error if there was evidence to

21  support the instruction.  Beck v. Alabama, 447 U.S. 625, 638 (1980).  However, in a noncapital

22  case, such as this case, the failure of a trial court to instruct sua sponte on lesser included

23  offenses does not present a federal constitutional question.  Windham v. Merkle, 163 F.3d 1092,

24  1106 (9th Cir. 1998); Turner v. Marshall, 63 F.3d 807, 813 (9th Cir.1995), *overruled on other*

25  *grounds* by Tolbert v Page, 182 F.3d 677 (9th Cir.1999) (*en banc*) (finding the application of

26  Beck to noncapital cases barred by Teague v. Lane, 498 U.S. 288, 299-300, 109 S.Ct. 1060, 1069

27  (1989));  James v. Reese, 546 F.2d 325, 327 (9th Cir.1976) (*per curiam*).  Moreover, the law is

28

1 even more unsettled with regard to, as the claim here, the duty to give an instruction on a lesser

2 *related* offense. However, a defendant may suffer a due process violation if the court's failure to

3 give a requested instruction prevents a defendant from presenting his theory of the case. Bashor

4 v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984), *cert. denied*, 469 U.S. 838 (1984); see also United

5 States v. Mason, 902 F.2d 1434, 438 (9th Cir.1990) ("A defendant is entitled to have the judge

6 instruct the jury on his theory of defense, provided that it is supported by law and has some

7 foundation in the evidence."). This principle is derived from the general rule that habeas relief is

8 only available when an erroneous jury instruction so infects the entire trial that the resulting

9 conviction violates due process. See Estelle v. McGuire, 502 U.S. 62, 72 (1991); Hendricks v.

10 Vasquez, 974 F.2d 1099, 1106 (9th Cir. 1992) (citing Cupp v. Naughton, 414 U.S. 141, 147

11 (1973)). However, a defendant is not entitled to a specific instruction supporting his theory of

12 the case if the other instructions, viewed as whole, adequately cover the defense theory. Cf.

13 Duckett v. Godinez, 67 F.3d 734, 743 (9th Cir. 1995). To this end, Petitioner contends that the

14 failure to instruct on the lesser related offense of accessory-after-the-fact precluded him from

15 presenting his theory of the case.

16      Here, in Count One, Petitioner was charged with murder in first degree in violation of

17 section 187(a). (CT 226.) In Count Two, Petitioner was charged with unlawful possession of a

18 firearm in violation of section 12021(A)(1). (CT 227.) The jury was instructed on the elements

19 of first degree murder and the lesser included offenses of second degree murder, voluntary

20 manslaughter, and involuntary manslaughter as to Count 1. (See RT 2261-2262, 2285-2292, CT

21 970-982.) In addition, Petitioner was not precluded and, in fact, vigorously argued that the

22 prosecution had failed to prove his guilt beyond a reasonable doubt. (See RT 2204-2240.)

23 Indeed, defense counsel pointed out that there were at least three individuals present at the scene

24 of the killing, and the defense had presented four individuals (Dale Carter (Lickity Split), Robert

25 Monsignor, Loren Hubbard (Zombie), and William Arnold (Billy the Kid)), none of whom were

26 Petitioner. (RT 2236.) Based on the foregoing, Petitioner simply was not prevented from

27 presenting his defense theory that he was not present at the scene of the killing and could not be

28 held liable for the murder of Ann Michaels.

Furthermore, after reviewing the record in its entirety, Petitioner did not have a constitutional right to have the jury instructed as to liability based on accessory after the fact (which was not charged) rather the all-or-nothing argument under the instructions given in this case.  Petitioner vigorously argued the prosecution had failed to meet its burden of liability as to the charged offense and any lesser-included offenses.  Moreover, the record does not indicate that the absence of the specific instruction had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

I.      Denial of Motion For Mistrial

Lastly, Petitioner contends that he was denied due process by the trial court's denial of his motion for mistrial based on the "arrest" and "defamation" of Kathy Nugent, a defense witness, who was arrested shortly after testifying and while she was still in the courtroom.

Petitioner raised this claim on direct appeal to the California Court of Appeal and California Supreme Court.  As with the preceding two claims, because the California Supreme Court summarily denied the petition, this Court looks through that decision and presumes it adopted the last reasoned state opinion of the Court of Appeal.  LaJoie v. Thompson, 217 F.3d at 669 n.7.

Respondent initially argues that Petitioner fails to allege a federal constitutional violation.  Respondent is correct to the extent Petitioner seeks to challenge the trial court's denial of his motion for mistrial under state law; however, the Court construes Petitioner's claim as arising under the Sixth and Fourteenth Amendments based on the exposure of certain jurors to extraneous information.

"In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . . trial  . . . by an impartial jury," U.S. Const., Amends. 6 and 14; see Duncan v. Louisiana, 391 U.S. 145 (1968).  In reviewing a claim of juror misconduct, "[t]he test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." United States v. Klee, 494 F.2d 394, 396 (9th Cir.), cert. denied, 419 U.S. 835 (1974).  Although it is generally preferred that a trial court hold an evidentiary hearing when allegations of juror

26

misconduct arise, it is not always required, particularly when the court knows the exact scope and nature of the misconduct.  See United States v. Halbert, 712 F.2d 388, 389 (9th Cir.1983); United States v. Hendrix, 549 F.2d 1225, 1227 (9th Cir.1977); see also United States v. McVeigh, 153 F.3d 1166, 1187 (10th Cir.1998), *cert. denied*, 119 S.Ct. 1148 (1999).  The Court is mindful of the fact that "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Rushen v. Spain, 464 U.S. 114, 118 (1983), *quoting* Smith v. Phillips, 455 U.S. 209, 217 (1982).  "The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974).  On collateral review, a petitioner must show that the alleged error "'had a substantial and injurious effect or influence in determining the jury's verdict.'" Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993) (quoting Brecht, 507 U.S. at 637.)

For ease of reference and background, the Court references the trial court transcript of the factual circumstances surrounding defense counsel's motion for mistrial, as it took place in the midst of trial:

After Kathy Nugent testified on behalf of Petitioner at trial, defense counsel made a motion for mistrial on the ground that Kathy Nugent was arrested in front of the jury, thereby prejudicing Petitioner.  (RT 1364-1365.)  The bailiff responded that she was not arrested but was merely cited for a misdemeanor warrant.  (Id.)  The trial court commented that it could give a curative instruction or admonition.  (RT 1365.)  The court agreed with defense counsel's request to inquire of the actual deputy who issued the citation.  (RT 1366.)

Deputy Eric Jackson was called to testify.  (RT 1369.)  Jackson testified that he was informed by the bailiff that Nugent had an outstanding warrant for Vehicle Code violations and failure to appear.  (RT 1370.)  Therefore, he waited outside the courtroom while she was testifying.  (Id.)  When she exited the courtroom, Jackson asked Nugent for identification, and she indicated it was downstairs.  (Id.)  The two of them proceeded downstairs toward the screening area in the front of the building.  (RT 1371.)  Jackson then handed her the ticket.  (Id.)  At that time, Jackson did not see any of the jurors around that area, and he was very discreet.  (RT 1372.)  Upon further questioning by defense counsel, Jackson indicated that he never told

1   Nugent she was under arrest, and she was never handcuffed.  (RT 1375.)  Jackson acknowledged

2   that when he was downstairs he saw some of the jurors; however, he never saw any jurors present

3   when he approached and cited Nugent.  (RT 1374.)

4          Defense counsel then called Walter Wallace, a licensed private investigator.  (RT 1376.)

5   Wallace observed Deputy Jackson approach Nugent when she exited the courtroom, and told her

6   she had a warrant and was under arrest.  (RT 1377.)  He observed jurors coming out of the

7   courtroom as Deputy Jackson and Nugent were going down the escalator.  (RT 1378.)  The

8   deputy was polite and professional when contacting Nugent.  (RT 1380, 1382.)

9          Defense counsel next called defense investigator Joe Serrano, who went downstairs to

10   inquire of the situation between Deputy Jackson and Nugent.  (RT 1383.)  When Serrano was

11   standing at the screening area of the courtroom talking to Jackson and Nugent, he observed a

12   couple jurors walk around him and go up the escalator.  (Id.)  The deputy never had a physical

13   hold on Nugent, and she was never handcuffed.  (RT 1385.)

14          After hearing the testimony and argument by both counsel, the trial court denied

15   Petitioner's motion for a mistrial, finding no violation of his right to a fair trial had been

16   established; however, the court would examine the panel to determine what anyone saw or heard

17   during the incident. (RT 1394-1395.)  To this end, the court indicated that it would tell the jurors

18   that Nugent received a citation for a "vehicular equipment violation," and then determine if

19   anybody observed the incident and what affect it would have on the juror's ability to be fair and

20   impartial.  (RT 1396, 1401-1402.)  In response to the court's statement, juror number (307649)

21   stated that he observed the incident, but it would not affect his ability to be fair and impartial.

22   (RT 1402.)  The court accepted the juror's statement and thereafter admonished the jury that the

23   "situation is not to in any way affect your ability to give both sides a fair trial."  (RT 1402.)  The

24   court further commented that "[i]t may not even be the witness' responsibility.  Peace officers

25   have to do certain things.  They have certain duties to fulfill."  (Id.)

26          At the close of trial that day, the court asked juror number (307649) some additional

27   questions about the situation involving Nugent.  The court specifically asked the juror what he

28   actually observed, and the juror explained that he saw the deputy hand Nugent a citation and may

1   have heard that she was "under arrest." (RT 1426.)  The juror later saw Nugent on the escalator

2   with a citation in her hand. (RT 1427.)  The juror indicated that he discussed his observation

3   with alternative juror number (404956), and another juror, whose name he could not recall.  (RT

4   1428.)  The court then recessed for the weekend.  (Id.)

5          When court resumed, juror number (307649) was recalled to inquire whether he

6   remembered the other juror with whom he discussed the incident.  (RT 1434.)  Upon questioning

7   by defense counsel, the juror indicated that when he was going down the escalator he believed,

8   although he was not 100 percent sure, he heard the words "warrant" and "perjury." (RT 1440.)

9   He later believed he heard the word "arrest." (RT 1441.)  On cross-examination, the juror

10  acknowledged that he "wasn't really paying close attention," and therefore could not be 100

11  percent sure exactly what he heard. (RT 1441-1442.)  The juror further stated that he heard the

12  word "perjury," but he could not "categorically, unequivocally tell you that it came from the

13  deputy, but I heard the word in the vicinity of the escalators as people were coming up and as I

14  was going down." (RT 1443.)  Defense counsel renewed his motion for mistrial. (RT 1440.)

15         The court denied the second motion for mistrial, but indicated that alternate juror number

16  (404956) would be questioned and dependent on what she said, counsel was free to renew the

17  motion for mistrial. (RT 1450-1451.)  Juror number (404956) indicated that she did not actually

18  see the incident.  Rather, juror number (307649) informed her that the sheriff's deputy spoke to

19  Nugent about a violation or something regarding perjury. (RT 1452.)  Although unsure, the juror

20  believed another juror may have overheard the conversation. (RT 1454.)  The juror told the court

21  that the incident would not affect her ability to be fair and impartial in the case. (RT 1453-1454.)

22         In response to questioning by defense counsel, juror number (404956) stated that she

23  would not give the reference to perjury any weight whatsoever. (RT 1455.)  In addition, she

24  assured counsel that the ambiguous reference to perjury would not affect her ability to be

25  impartial in the case and did not believe it had any bearing on the case at hand. (RT 1456-1457.)

26         The trial court recalled Deputy Jackson for further questioning. (RT 1466.)  Jackson

27  indicated that he did not hear and did not say the word perjury when he was issuing the citation

28  to Nugent. (RT 1469.)

1   The court granted defense counsel's request to further question juror number (307649)

2   regarding the references to the word "perjury." (RT 1472.) The juror indicated that he was

3   unsure whether the reference to perjury related to the present case or some other case in the

4   courthouse. (RT 1476-1477.) The juror told the court that he could put everything aside that he

5   heard outside the courtroom, but acknowledged to defense counsel that there was always the

6   possibility it may affect his reasoning. (RT 1477-1478.) After questioning this juror, the

7   prosecutor indicated that he would not object to excusing juror numbers (307649) and (404956),

8   and defense counsel renewed his motion for mistrial. (RT 1484.) Out of an abundance of

9   caution and by stipulation, the court excused both jurors (307649) and (404956), and denied

10   Petitioner's motion for mistrial. (RT 1490, 1491-1494.)

11   After reviewing the trial court proceedings, the state appellate court denied Petitioner's

12   claim and held as follows:

13   Kathryn Nugent testified for the defense. After she was excused, the court
14   gave the jury a 15-minute break. The court remained on the record with counsel
and discussed some issues. During this discussion, defense counsel stated that he
15   just learned that Nugent had been arrested in front of the jury. Defendant made a
motion for mistrial.

16   It was established that when Nugent left the courtroom she was
17   approached by Deputy Sheriff Eric Jackson and was told he had a warrant for her
arrest. Deputy Jackson had been told by the bailiff that there was a violation and
warrant against Nugent. Jackson testified that he gave Nugent a citation and let
18   her go.

19   When the jurors returned to the courtroom, the court asked if anyone saw a
20   witness get an equipment violation. Juror No. 307649 said he did see it but it
would not affect his ability to be fair and impartial.

21   The court questioned No. 307649. He said he saw the officer with Nugent
22   on the escalator. He saw the officer lean over and hand her something and he
thought he heard "under arrest" being said by the officer. He said he mentioned
what he saw to alternate juror No. 404956.
23

24   The court questioned No. 307649 again after the weekend recess. The
juror again verified he could be fair. Defense counsel was given the opportunity
25   to question the juror. He said he heard the words "warrant" and "perjury" when
he was following Nugent down the escalator, but he may have misunderstood.
Defense counsel renewed his motion for mistrial. The juror said he heard
26   "warrant" and heard "arrest" and may have heard the word "perjury." The juror
clarified that he heard the word "perjury" but he could not unequivocally state that
27   it came from the deputy.

28   Defense counsel renewed his motion for mistrial. The court denied the

30

motion for mistrial, giving defense counsel the option of renewing it if further evidence was revealed.

The court then questioned alternate juror No. 404956.[7] She said that No. 307649 came into the cafeteria and mentioned what had happened about a citation and something about perjury. She thought juror No. 249083 might have been in on the conversation. She said she could be impartial.

Deputy Jackson was called back and questioned. He said he did not use the word perjury.

The jurors were asked as a group if any of them witnessed the incident between Deputy Jackson and Nugent. Only No. 307649 responded. The court then asked if any of the jurors head anything about the incident indirectly. Only No. 404956 indicated that she had.

The court questioned Juror No. 249083 because No. 404956 said she thought that juror had heard the conversation between No. 307649 and No. 404956.

No. 249083 said she didn't hear anything except that something had happened, so she stood up and saw Nugent standing with a deputy. She said "we" went up the escalator and stood but didn't see anything but the officer standing with her. The following questioning took place.

"A. [249083] I–you know, it was like he came in, something was happening, curiosity, got up and went to see, but I could not tell you what–if there was a dialogue that he heard, I cannot tell you what he said because I don't remember anything except, you know, just getting up to go up to see. We walked up from the cafeteria, took the escalator back up here to sit and wait for the court to start again.

Q. [Defense Counsel] But are you telling us that several jurors went to see what he was talking about?

A. Yes, I mean (404956), Mrs. -

THE COURT: (404956)?

A. Yeah, we all just sort of trailed up, and I can't even tell you all of us that were downstairs when he came in. It was just a moment of time, you might say, but it wasn't like we all sat around and listened to him real hard or anything.

BY MR. BRYAN [defense counsel]:

Q. Well, I'm not asking whether or not you listened hard, but I'm very interested in what he might have said or what you might have heard.

A. To be real honest with you, I cannot–all he said is something's happening at that station when we come in, so–that's all he said–or that's all I can remember. So we got up out of curiosity and went to see.

---

[7] This juror was subsequently seated as a juror during the time the Nugent incident surfaced.

1    But he didn't say–in my mind I can't tell you anything more, because there's nothing else there right now.

2

3    Q. Do you remember anyone else being present besides Mr. (404956) when he said that?

4    THE COURT: Miss (404956), right?

5    MR. BRYAN: Miss (404956), right.

6    A. No, I can't.  I'm real sorry.  I actually can't tell you who all else was around.  We just sort of meander in and out and sit around and enjoy each other's company."

7

8    The court denied the motion for mistrial but gave defense counsel the option of dismissing No. 404956 and No. 307649.  Defendant stated he would like the jurors dismissed.

9

10    The court explained to the remaining jurors what it had done and said that the jurors had not done anything wrong.  The court asked the remaining jurors to tell the court if anyone felt he or she could not be fair and impartial.

11

12    .................................................................................................................

13    The trial court and counsel thoroughly questioned the jurors.  The jurors involved in the incident were dismissed out of an abundance of caution even though both of them said it would not affect their decision and they could be fair and impartial jurors.  The curative measures by the trial court were sufficient.  The trial court did not abuse its discretion when it denied the motion for mistrial.

14

15

16 (Lodged Doc. No. 1, Opinion, at 27-31.)

17    The state courts' determination of this issue was not contrary to, or an unreasonable

18 application of, clearly established Supreme Court precedent.  Petitioner contends that other jurors

19 were exposed to the incident regarding Nugent and failed to admit such to the trial court.

20 However, Petitioner provides nothing more to support his claim than pure speculation.  To the

21 contrary, the record supports the appellate court's finding that the trial court did not abuse its

22 discretion in denying his motion for a mistrial.  The entire panel was questioned extensively

23 regarding the issuance of the citation to Nugent, and the only jurors who were actually exposed to

24 such incident, were dismissed, by stipulation, out of an abundance of caution.  Moreover, the trial

25 court specifically admonished the jury panel that the incident involving Nugent was not to affect

26 their ability to be fair and impartial.  (RT 402.)  Indeed, Petitioner presents no evidence to

27 indicate that the jury did anything other than exactly that, and the jury is presumed to follow the

28 court's instructions.  Weeks v. Angelone, 528 U.S. 225, 234 (2000); Francis v. Franklin, 471

U.S. 307, 324-325 n.9 (1985).  Given the trial court's cautious and careful efforts to ensure

Petitioner a trial by a fair and impartial jury, including extensive examination of the jurors

exposure to any potential prejudice and subsequent curative action, it simply cannot be said that

the appellate court's denial of this claim "resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States" or was an unreasonable determination of the facts in light of the

evidence before it.  28 U.S.C. § 2254(d).

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The petition for writ of habeas corpus be DENIED; and,

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District

Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of

the Local Rules of Practice for the United States District Court, Eastern District of California.

Within thirty (30) days after being served with a copy, any party may file written objections with

the court and serve a copy on all parties.  Such a document should be captioned "Objections to

Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served

and filed within ten (10) court days (plus three days if served by mail) after service of the

objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th

Cir. 1991).


IT IS SO ORDERED.

**Dated:    April 5, 2010**                            _____/s/ Sandra M. Snyder_____
                                                      UNITED STATES MAGISTRATE JUDGE